## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CELLMARK USA, LLC and | : | |
| ANMAR INTERNATIONAL LTD., | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.: |
| | : | |
| v. | : | |
| | : | |
| ALAN POLLARD, | : | |
| | : | |
| Defendant. | : | April 2, 2018 |
| | : | |
| | : | |

### VERIFIED COMPLAINT

Plaintiffs CellMark USA, LLC ("CellMark") and AnMar International Ltd. ("AnMar"),

together referenced hereafter as "Company", bring this action against Defendant Alan Pollard.

In support of this Verified Complaint, the Company alleges as follows:

1.    The Company brings this action against Pollard for misappropriating the

Company's confidential and proprietary information and/or trade secrets ("Protected Company

Information"), refusing to return the Protected Company Information, and failing to comply with

the notice period for which his Employment Agreement provides before he separates from the

Company following his notice of resignation.  Pollard has violated his contractual and common

law obligations to the Company and necessitated this lawsuit after the Company provided him

with ample notice and opportunity to correct his course and comply with his obligations.  At this

time, the Company seeks temporary restraints, expedited discovery, and preliminary injunctive

relief.

2.    The Company also seeks damages from Pollard for conduct separate and apart

from that set forth above.  As set forth more specifically below, the Company remunerated

Pollard more liberally than was required under his Employment Agreement based upon his commitment to execute certain responsibilities.  Pollard failed to fulfill that commitment.  As a result, the Company is entitled to recoup from Pollard the excess compensation it remitted to him.  Additionally, Pollard publicly disparaged the Company and its employees to certain of the Company's customers.  The Company seeks damages from Pollard for such harm as results from those disparaging remarks.

**Parties**

3.    CellMark is incorporated in Delaware and has its principal place of business in Connecticut.

a.    CellMark acquired all of the stock of AnMar on September 2, 2014.

b.    CellMark has operated AnMar since September 2, 2014.

4.    Pollard is a New Jersey resident.

a.    As an executive and Corporate Officer of AnMar, Pollard has worked from his home in New Jersey reporting to the Company's President, Hugo Galletta, at the Company's headquarters office in Connecticut.

b.    Pollard is party to an Employment Agreement with CellMark ("Agreement") that, pursuant to ¶ 10 of the Agreement, became effective when CellMark acquired AnMar.  (A copy of the Agreement is appended as Exhibit A.)

**Jurisdiction and Venue**

5.    This dispute arises under 28 U.S.C. § 1331 because it involves diverse parties and an amount in controversy that exceeds $75,000.

## Facts

6.      Pollard was the Senior Vice President of Sales for AnMar when CellMark acquired AnMar.  On September 2, 2014, following the acquisition, Pollard was appointed Senior Vice President of Sales and a Corporate Officer of AnMar, which carries certain fiduciary responsibilities.

      a.      In the Agreement, Pollard's position is referenced as Senior Vice President of Sales.

      b.      Between 2014 and 2017, the title that Pollard showed on his business card was "Senior Vice President of Sales".

7.      The Company has compensated Pollard quite generously since the acquisition. Between 2015 and 2017, Pollard's total annual compensation has ranged from more than $450,000 to more than $570,000.

8.      A substantial portion of Pollard's compensation is comprised of Performance Incentive Commission ("Commission").

      a.      Under ¶ 4 of the Agreement, Pollard's Commission is tied to AnMar's gross profit.

      b.      Since Pollard's Commission is tied to AnMar's gross profit, the size of Pollard's Commission has been determined by the performance of AnMar overall and, more particularly, AnMar's sales staff (which Pollard supervises).  In turn, this means that Pollard's Commission has also included the profit generated by other AnMar sales team members.

      c.      Paragraph 4 of the Agreement provides for the calculation of Pollard's Commission on the basis of a percentage of AnMar's gross profit, with that percentage declining by 1% in each year of the Agreement as follows:

|  |  |
|---|---|
| 9/1/14-8/31/15 | 8.25% |
| 9/1/15-8/31/16 | 7.25% |
| 9/1/16-8/31/17 | 6.25% |
| 9/1/17-8/31/18 | 5.25% |

   d.  In addition to the above Commission structure, the Agreement has provided Pollard with an opportunity to earn 10% of AnMar's gross profit in excess of 5.5 million dollars each calendar year.

   e.  In the Agreement, the premise for Pollard's commission structure was that Pollard would transition all of his existing gross profit responsibility to other AnMar sales team members and focus his attention on developing (i) new customers and (ii) new business through the sale of new products to existing customers. This was a key component to AnMar's general business plan.

   9.  Between September 1, 2015 and the present, the Company paid Pollard $96,681.61 more than was required of it by the Employment Agreement.

   a.  After Cellmark's first year of owning AnMar, the Company discovered that Pollard was not transitioning his gross profit responsibility and was not focused on generating new business, which was the basis of his overall commission structure and AnMar's general business plan.

   b.  The Company pointed out to Pollard that the Company could increase its sales and gross profit, benefiting both the Company and Pollard, if Pollard executed AnMar's general business plan. The Company's general business plan projected certain increases in revenue based upon development of new business and contemplated Pollard, as the senior sales executive, leading the effort to cultivate and attract new customers while AnMar's sales staff serviced existing customers.

c.      On September 1, 2015, in a show of good faith, the Company agreed to delay the onset of the 1% decrease in Commission rate provided that Pollard transitioned a minimum of 50% of his gross profit responsibility to other AnMar sales team members by August 31, 2016 and focused his efforts on generating new business consistent with the premise for how Pollard's commission structure was devised.

d.      Pollard resisted and never fully transitioned his gross profit responsibility to other AnMar sales team members.

e.      Between September 1, 2015 and the present, the deferral of the 1% reduction in Commission rate resulted in the Company paying Pollard $96, 681.61 more than was required of it under the Employment Agreement even though Pollard failed to fulfill his commitment to transition a minimum of 50% of his gross profit responsibility to other AnMar sales team members by August 31, 2016.

10.     Because Pollard failed to comply with the agreement described above in ¶ 9(c), the Company took numerous steps to convince Pollard to comply with AnMar's general business plan by transitioning existing customers to his sales staff and concentrating his efforts upon developing new customers.  At times Pollard would make it appear that he was complying in part, but in reality he continued to resist the Company's business plan.

11.     In October 2017, several employees witnessed Pollard make disparaging remarks about the Company and its personnel in the presence of customers.

12.     On November 1, 2017, Galletta and Costanzo met with Pollard to address conduct like that referenced in ¶ 11 above as well as Pollard's failure, over more than two years, to transition fully his gross profit responsibility to his sales staff and concentrate on developing new business.  On November 2 and again on November 27, they issued Company Directives to

Pollard that memorialized the substance of the November 1, 2017 meeting. Among the key points made during the November 1 meeting and in the Company Directives were the following:

a.      Pollard was to refrain from disparaging the Company internally or externally and to communicate with others professionally.

b.      Even before CellMark acquired AnMar, Pollard was fully aware that following the acquisition the Company expected him to transition gross profit responsibility to his sales staff and focus his efforts on developing new business consistent with the premise for how Pollard's commission structure was devised.

c.      Since September 2, 2014, Pollard had failed to execute AnMar's business plan adequately, let alone fully, and senior management was now directing him to do so without fail.

d.      Pollard was to transition all his gross profit responsibility to the AnMar sales team no later than January 15, 2018.

e.      Pollard was to focus his attention on developing new business and advising his sales team members as needed.

f.      Pollard was to refrain from issuing quotes to customers, approving sales orders, or approving purchase orders.

g.      If existing customers contacted Pollard regarding existing business, he was to direct those communications to his sales staff. Pollard was free to develop new business with existing customers with respect to new products.

13.     Because Pollard had, for so long, so strongly resisted the Company's business plan that he transition existing gross profit responsibility to his staff and concentrate his efforts on developing new customers, the Company also conferred upon him a new position title--

Advisor & New Business Developer--underscoring the Company's insistence that he comply with this directive.

14.     Following the November 1 meeting, Pollard forwarded an email to Galletta and Costanzo in which he stated that he no longer wished to be an AnMar Officer and requested that the Company remove him from such documents that showed him as an Officer.  However, in early January 2018, Pollard requested that the Company retain the phrase "Senior Vice President" in his title and the Company complied by revising his position title to "Advisor and New Business Developer, SVP".   Because Pollard remained a Senior Vice President, the Company never removed him as an Officer of AnMar.

15.     In emails that Pollard sent to Galletta on December 2, 7, and 14, Pollard communicated his continued resistance to senior management's direction.

16.     By mid-January 2018, it remained apparent that Pollard was continuing to resist the Company's Directives and was not following through by meaningfully modifying his conduct.  As a result, in a performance review dated January 23, 2018, Galletta set forth the Company's continuing criticisms of Pollard's performance.  On that same date, Galletta issued a "Final Warning Notice" to Pollard that detailed Pollard's performance deficiencies and advised him that he would be disciplined, including possible discharge, unless he overcame his deficiencies and implemented the Company Directives.  Among the key points covered by the performance review and the Final Warning are the following:

a.     The Final Warning memorialized that Pollard had instigated certain customers to write to the Company complaining about the change in his responsibilities.  The Company had a suspicion that Pollard had orchestrated these communications from certain customers because the letters were remarkably similar. Then, a customer volunteered to the

Company that Pollard had in fact urged the customer to write the Company and even provided the customer a template for doing so.

        b.      The Final Warning also memorialized that with respect to certain customers, Pollard had (i) urged the customer to refuse to meet with AnMar sales team members responsible for the customer, (ii) met with or communicated with the customer without properly involving the AnMar sales team member responsible for the customer, and/or (iii) urged the customer to include Pollard on communications with the AnMar sales team member responsible for the customer despite having been instructed to the contrary.

        c.      The performance review memorialized that Pollard had failed to develop new customers and that the Company's gross margins had declined in 2017.

        d.      In the performance review, Pollard maintained that he needed to continue to interact with existing customers to remain "current with the market".  Galletta's retort to Pollard's comment was that an employee who is the Inventory Planner and Buyer supports Pollard fully by gathering market information, sourcing and qualifying suppliers and products, pricing product costs, and recommending product pricing.

        e.      The Final Warning directed Pollard, in the presence of other AnMar sales team members responsible for a specific customer, to reassure the existing customers that had written the Company to complain about the change in his responsibilities that the employee responsible for the account would handle the customer's needs proficiently.

        f.      The Final Warning also directed Pollard to refrain from complaining to customers about his changed responsibilities and to direct the existing customers to communicate and meet with the assigned member of the sales staff rather than Pollard.

17.      On February 16, 2018, the Company placed Pollard on an unpaid administrative leave pending further investigation of wrongful conduct in which he had engaged.  The Company placed Pollard on unpaid administrative leave for two reasons.  The first reason was that the Company learned that Pollard had recently been transmitting large quantities of Protected Company Information to personal email accounts of himself and his wife and then deleting from his "sent" folder many of the emails in which he did so.  The second reason was that Pollard had continued to refuse to comply with the Company Directives, even after the January 23, 2018 written Final Warning.

a.      On February 14, senior management learned that Pollard had transmitted several emails to his and his wife's personal email accounts that contained Protected Company Information.  A deeper analysis disclosed that Pollard had long been violating the Company IT Policy by removing Protected Company Information from the Company network and placing it in his and his wife's personal email accounts and personal electronic devices ("Personal Accounts and Devices").  Even worse, during the period November 2017 through February 2018, which coincided with Pollard resisting the Company's more forceful insistence that he comply with the Company Directives, there had been a significant spike in Pollard's transmission of Protected Company Information to his and his wife's Personal Accounts and Devices.  A summary of this deeper analysis follows in subparagraphs (b) through (i).

b.      In 2016, Pollard forwarded his wife 317 emails, 138 of which had attachments and **none** of which were deleted from his "sent" account.

c.      In 2017, Pollard forwarded his wife 1357 emails, 874 of which had attachments and 318 of which were deleted from his "sent" account.

d.      Between just November 1 and December 31, 2017, Pollard transmitted 440 emails to his wife, 310 of which had attachments and 182 of which were deleted from his "sent" account.

e.      Between January 1 and February 16, 2018, the dramatic increase in activity in November-December 2017 continued: Pollard forwarded his wife 447 emails, 357 of which had attachments and 186 of which were deleted from his "sent" account.

f.      Pollard's transmission of emails to his own personal account, though not as prolific as his transmissions to his wife, is eye-catching as well.  In 2016, he transmitted to his personal email account 159 emails, 40 of which had attachments and **none** of which were deleted from his "sent" account.

g.      In 2017, Pollard forwarded to his personal email account 546 emails, 313 of which had attachments and 47 of which were deleted from his "sent" account.

h.      Between November 1 and December 31, 2017, Pollard transmitted 123 emails to his personal email account, 90 of which had attachments and 20 of which were deleted from his "sent" account.

i.      Between January 1 and February 16, 2018, Pollard forwarded 65 mails to his personal email account, 51 of which had attachments and 29 of which were deleted from his "sent" account.

j.      When the Company placed Pollard on administrative leave, it was not aware of him having taken any steps to rectify his misconduct in orchestrating customer communications expressing dissatisfaction with the change in his responsibilities and misleading customers into believing that only Pollard, rather than members of his staff, could satisfy their needs.

18.     The February 16 letter informing Pollard of his leave required him to return to the Company for the purpose of its investigation his Company-issued laptop, iPad, and iPhone. Initially Pollard did not comply.  However, on February 22, the Company received the laptop, the iPad, and the iPhone.

a.     Company personnel, including Pollard, execute their responsibilities and communicate with others using the Company's network.

b.     Pollard, like other Company personnel, used a laptop provided to him by the Company to perform his work.  Because Pollard worked principally from his home, the Company set up his laptop in his home along with a monitor, printer, fax, copier, and scanner.

c.     The Company issues mobile electronic devices, such as iPhones and iPads, to personnel so that they can execute their responsibilities and communicate with others when not located at their regular work station.  Pollard had a Company-issued iPhone and iPad.

d.     The Company has a policy entitled Information Technology Security and Usage Directives for End Users ("Company IT Policy").  The Company IT Policy prohibits Company personnel from transmitting or storing Protected Company Information outside the Company.

i.     One purpose of limiting transmission and storage of Protected Company Information to Company email accounts and Company files that are stored on the Company network is to ensure confidentiality.

ii.     Another purpose is to ensure that Protected Company Information is properly backed up and stored and subject to Company disaster recovery procedures.

iii.     Transmission and storage of Protected Company Information outside the Company's network renders the Company vulnerable to its misappropriation and loss.

e.     At all times Pollard was subject to the Company IT Policy.  At no time did any authorized Company representative indicate, directly or indirectly, that Pollard was exempt from its requirements.

f.     Notably, even though Pollard professes to have limited knowledge and comfort with personal devices, he returned the iPad and iPhone reset to factory settings.  The effect of doing so is to wipe clean and eliminated from the devices the data on them.

g.     As indicated in ¶¶ 25, 27(e), and 28 below, the Company has repeatedly requested that Pollard consent to it examining the Apple iCloud account it set up (as a Company account) and provide it with his log in credentials to permit it to access such data from the iPad and iPhone as was captured in the Apple iCloud account.  Pollard has repeatedly refused to provide consent and his log in credentials despite the Company assuring him and agreeing to enter into a protocol that would compel the use of industry best practices by a forensic professional to ensure that the Company would not access any private information.

h.     Pollard's refusal to provide consent and log in credentials to the Apple iCloud account that the Company set up as a Company account when the Company will take all appropriate steps to protect his private information permits no other conclusion than Pollard is concerned that the Company's examination of the data stored there would indicate wrongdoing on his part.

12

i.      Resetting his laptop would not have had the same effect of camouflaging data as took place with the iPad and iPhone because emails Pollard sent or received on his laptop were captured on the Company network.

19.     On February 20, 2018, Pollard's attorney informed the Company that Pollard was resigning after the close of business on March 2, 2018.

a.      Pollard asserted that the Company had either directly or constructively terminated him as of February 16.  However, Pollard also maintained that he would remain in the Company's employ through and including March 2 despite the alleged direct or constructive termination on February 16.

b.      Pollard also asserted that the Company was to remit monies to him consistent with him remaining employed through March 2 (meaning that he would separate on March 3).

20.     On February 22, Galletta forwarded an email to Pollard informing him that he remained on unpaid administrative leave.  The February 22 email also stated clearly that, in view of Pollard having deleted data by resetting the iPad and iPhone to factory settings, Pollard should take steps to preserve all data on any device or in any account that related to the Company and its business.

21.     On February 23, Pollard replied to Galletta by stating that he disagreed with the substance of Galletta's email.

22.     On February 24, Galletta responded to Pollard's February 23 email by stating the following: (a) Pollard remained an employee of the Company despite the Company having placed him on unpaid administrative leave pending investigation of his actions, (b) his separation from the Company after March 2 would be the result of Pollard resigning his employment, and

(c) the claim by Pollard's attorney that the Company had discharged him was mistaken and Pollard's separation after March 2 would be a voluntary resignation of his own choice. Galletta's February 24 email also stated that the Company was not prejudging the outcome of its investigation of Pollard's conduct, Pollard had nothing about which to be concerned if he had not engaged in wrongdoing, and the Company would take legal action to protect itself in the event it turned out that Pollard or anyone on his behalf might inflict harm upon the Company.

23.     From the Company's standpoint, Galletta's February 24 email was quite clear and, in conjunction with Galletta's prior communications, provided Pollard ample opportunity to reverse course, attempt to resolve his differences with the Company appropriately, and rescind his resignation.  Through the end of February, Pollard failed to communicate anything to the Company to suggest he was availing himself of that opportunity.

24.     On March 1, 2018, having heard nothing further from Pollard and recognizing that his stated intention was to separate after March 2, Galletta again wrote Pollard by email to indicate the following:

a.     The Company understood that Pollard intended to separate from the Company.

b.     Under Paragraph 6(D) of his Employment Agreement, Pollard's resignation from the Company required that he provide 60 days' notice.  Since the letter from Pollard's attorney on February 20 was the first notice that the Company had received of Pollard's resignation, the Company expected Pollard to honor his notice commitment and refrain from separating until April 20, 2018.

c.     The Company expected Pollard to comply with all post-employment obligations for which his Employment Agreement provides following his separation.

14

25.     In his March 1 email as well as an accompanying March 1 letter, Galletta reiterated that Pollard should comply with his data preservation obligations and further requested that Pollard provide the Company with consent and log in credentials to permit the Company to examine the Apple iCloud account that the Company had set up to connect to Pollard's iPad and iPhone (as well as his Company email account).

26.     On March 2, Pollard's attorney responded to Galletta's email.

      a.     In effect, Pollard disputed that he was bound by any notice obligation.

      b.     Pollard conceded that he had deleted data from the iPhone and iPad, maintaining that he had deleted "personal, non-work related information".

      c.     Pollard stated that he "will not take any action going forward to delete information, if any, that may remain in the 'cloud' in the event that that information is needed at some point in the future".

      d.     Pollard did not indicate under what circumstances he would provide the Company with consent and log in credentials to examine its Apple iCloud account as Galletta had requested.  In other words, although the March 2 letter spoke in terms of the possibility that information in the Apple iCloud account could be "needed at some point in the future", it failed to indicate when Pollard would agree that moment had arrived.  Undeniably, Pollard provided neither the consent nor the log in credentials that Galletta had requested for the Company to access its Apple iCloud account.

      e.     Nowhere did Pollard reference the Company's direction on March 1 that he take steps to preserve data relating to the Company that exists on personal electronic devices and personal email accounts that are in his possession, custody, or control.

27.     On March 5, Company counsel wrote to Pollard's counsel and conveyed the following:

a.     Pollard's declaration that his employment with the Company had ended on March 2 (and, therefore, that he had separated from the Company on March 3) was a breach of his notice obligation under the Employment Agreement.

b.     That breach of contract, by itself, was quite grave and Pollard was to refrain from any conduct inconsistent with that expected of a Company employee through April 20.

c.     The Company had placed Pollard on unpaid administrative leave because there was evidence of faithless conduct on his part and the Company was utilizing forensically sound practices to examine data that it believed Pollard had misappropriated that included Protected Company Information.

d.     Pollard was wrongly attempting to confuse issues in maintaining that the Company had belatedly informed him that he could not use Company-issued electronic devices for personal use.  The Company's clearly-stated concern was that Pollard had violated Company policy by transferring Protected Company Information to his and his wife's personal email accounts and electronic devices.

e.     The Company (i) remained distressed over Pollard's failure to provide consent and log in credentials to the Apple iCloud account so that the Company could examine data that Pollard had deleted from the Company-issued iPad and iPhone and (ii) reiterated its request that Pollard provide consent and log in credentials since recovery of the data could be time-sensitive.

      f.      The Company reaffirmed that its decisions as to Pollard were justified by legitimate business considerations.

      g.      The Company disputed Pollard's contention that the Company needed to remit resignation-related monies to him before he separated on April 20, but it would remit such monies to Pollard before then with the proviso that doing so was an accommodation to his insistence that it do so and not inconsistent with its position that he is precluded from separating until April 20. The Company further reserved its right to recover the monies it remitted in the event a Court Order authorized it to do so.

      h.      The Company expects Pollard to comply strictly with his post-employment obligations to the Company.

      i.      The Company intends to enforce the tolling provision of the Employment Agreement to extend the length of any restrictions upon Pollard in the event he violated his obligations.

28.      On March 12, Company counsel reported to Pollard's attorney the data that is set forth in ¶ 17 above and once again urged that Pollard agree to provide consent and log in credentials to the Company so that a forensic professional could access the Apple iCloud account to enable the Company to attempt to recover the data that Pollard had deleted from the iPad and iPhone.

      a.      The Company pointed out that Pollard's failure to provide access to the Apple iCloud account was interfering with the Company's investigation.

      b.      The Company further pointed out that since Pollard had forwarded Protected Company Information to the Personal Accounts and Devices, the Company also needed to access the Personal Accounts and Devices as well as part of its investigation.

c.      As it had previously, the Company committed to the use of best industry practices to ensure that it would not access private information of Pollard and his wife that did not concern or relate to the Company's business in examining the Apple iCloud account or the Personal Accounts and Devices.

d.      The Company also indicated that it was amenable to interviewing Pollard as part of its investigation.

29.      On March 14, Pollard's attorney replied.

a.      Pollard contended that he had not improperly utilized Protected Company Information and "ha[d] no need for that information at this time".

b.      If necessary, Pollard would revisit the Company's request to access "Company information that may or may not be on Mr. Pollard's personal accounts…at the appropriate time" without addressing the Company's point that recovery of the data might very well be time-sensitive or indicating more specifically when the time would arrive at which Pollard would comply with the Company's request.

c.      Pollard rejected the Company's proposal that he sit for an interview as part of its investigation into his conduct, including his transmission of Protected Company Information to the Personal Accounts and Devices.

30.      The March 14 letter from Pollard's attorney provided numerous supposed explanations for Pollard's earlier conduct and communications.  In a March 19 letter, Company counsel addressed them.  Because Pollard's explanations are far-fetched and nonsensical, the Company does not address them in detail here or below.  However, on March 15, the very day after receiving the March 14 letter from Pollard's attorney, Company counsel communicated to Pollard's counsel by email that the Company was extremely disappointed that Pollard had

continued to refuse to provide access to the Apple iCloud account, refused to provide access to the Personal Accounts and Devices, and declined to sit for an interview as part of the investigation.

31.     Apart from responding to Pollard's far-fetched and nonsensical explanations set forth in his attorney's March 14 letter, Company counsel's March 19 letter made the following points:

        a.     Irrespective of the reasons Pollard expressed for transmitting Protected Company Information to the Personal Accounts and Devices, his admission that he had done so necessitated his **immediate** acquiescence to the forensic examination that the Company had proposed so that the Company could secure the return of both its Protected Company Information as well as such communications to its customers and suppliers ("Customer/Supplier Communications") as Pollard had transmitted outside the Company's network.

        b.      The Company further clarified that the forensic examination should include the Apple iCloud account as well as the Personal Accounts and Devices.

        c.      Without drawing the Court "into the weeds" of Pollard's explanations for his conduct, the Company pointed out that Pollard had transferred Protected Company Information from the Company network to his and his wife's personal email accounts and electronic devices while sitting in his home.  In other words, he had moved an enormous quantity of Company business information out of the Company's protected network into his personal network so that he could access the same data in his home on his personal network rather than from the Company network.

   d.  Pollard's deletion of many of the emails by which he had sent Protected Company Information from the Company network to his personal network indicated an attempt to camouflage his misappropriation of the Protected Company Information.

  32. At this time, the Company also forwarded Pollard a check containing the resignation-related monies.  The Company specifically reserved its position that (a) it was not obligated to remit the monies to Pollard at this time, it was only doing so because he had insisted, and the remittance at this time was without prejudice to his obligation to refrain from separating from the Company until April 20 at earliest, (b) remittance of salary for the period of Pollard's unpaid administrative leave was without prejudice to the Company's right to recover those monies, and (c) remittance of the entire sum of money was subject to the Company's right to recoup it as a result of a court determination that Pollard had engaged in wrongful conduct.

  33. On March 22, Pollard's attorney replied by email indicating that Pollard (a) disputed that he had voluntarily separated from the Company, (b) "has not used and is not using any confidential information of AnMar" and "does not want it or need it", and (c) would not agree to an "intrusive inspection of his personal devices at this time". Once again, Pollard did not indicate when a forensic examination of the Personal Accounts and Devices might be acceptable to him.

**COUNT I**
**BREACH OF CONTRACT**

  34. The Company repeats and realleges the allegations in ¶¶ 1-33 as if fully set forth herein.

  35. The Agreement between Pollard and the Company is a valid contract supported by consideration under which the Company performed.

36.     Under ¶ 8 of the Agreement, Pollard agreed to "treat[ ] as private, privileged, and confidential" the Protected Company Information and that he "shall not disclose or release any of such information in any way to any person, firm or institution at any time during [his] employment…or after any termination of said employment, whether termination is voluntary or involuntary".  Pollard further agreed that "upon termination of [his] employment…whether termination shall be voluntary or involuntary…[he] shall cease using…all such trade secrets and other confidential information and shall surrender to the Company any lists, books, records, indices, notes, files, papers, documents or materials of whatever kind or nature which refer or relate in any way to the Company or the business…."

37.     Pollard breached ¶ 8 of the Agreement by transmitting a large volume of Protected Company Information to the Personal Accounts and Devices (a) in anticipation of utilizing it on behalf of himself and enterprises other than the Company and (b) upon information and belief, actually utilizing it on behalf of himself and enterprises other than the Company.

38.     Pollard breached ¶ 8 of the Agreement by refusing the Company's several requests that he agree that a forensic professional use industry best practices to examine and recover the Protected Company Information and Customer/Supplier Communications from the Personal Accounts and Devices as well as the Apple iCloud account set up by the Company.

39.     Under ¶ 6(D) of the Agreement, Pollard had to provide the Company with 60 days' notice of separation following his February 20, 2018 resignation notice.

40.     Pollard breached ¶ 6 of the Agreement by declaring by letter dated February 20, 2018 that his last date of employment with the Company was March 2 and, therefore, that he was separated from the Company effective March 3.  Since 60 days from February 20 is Saturday,

April 21, the work week concluding on April 20, 2018 is 60 days from Pollard's February 20 resignation.

## COUNT II
## VIOLATION OF DUTY OF LOYALTY

41.    The Company repeats and realleges the allegations in ¶¶ 1-40 as if fully set forth herein.

42.    At common law, an employee has a duty of loyalty to his employer that continues even after the employee has separated from employment.  The duty of loyalty includes but is not limited to an obligation (a) to utilize the employer's confidential and proprietary information solely in the employer's interest, (b) following separation from that employment, to refrain from utilizing that former employer's confidential and proprietary information for the benefit of the former employee and/or any other enterprise, and (c) upon request by the former employer, to return to the former employer its confidential and proprietary information and confirm that the employee no longer has possession, custody, or control of the former employer's confidential and proprietary information.

43.    While an employee of AnMar, Pollard has breached his duty of loyalty by (a) transmitting Protected Company Information to the Personal Accounts and Devices, (b) attempting to camouflage those transmissions, (c) refusing to return the Protected Company Information to the Company, (d) conducting business with the Company's customers and suppliers on his personal network rather than the Company's network, (e) disparaging the Company to its customers and suppliers, (f) refusing to provide the Company with Customer/Supplier Communications, and (g) upon information and belief, conducting business with the Company's customers and suppliers for the benefit of himself and enterprises other than the Company while he remains in the employ of the Company.

22

## COUNT III
## MISAPPROPRIATION AND CONVERSION

44.     The Company repeats and realleges the allegations in ¶¶ 1-43 as if fully set forth herein.

45.     At common law, the unauthorized taking or retention of property that belongs to another is conversion.

46.     At common law, the unauthorized taking or retention of information that belongs to another is misappropriation.

47.     The Company's IT Policy prohibits personnel from removing Protected Company Information from the Company network.

48.     Pollard knowingly removed a significant volume of Protected Company Information from the Company network.

49.     When the Company discovered that Pollard had placed this significant volume of Protected Company Information on his personal network and repeatedly requested that he agree that a forensic professional use industry best practices to remove it from his personal network and return it to the Company, Pollard repeatedly refused the Company's requests.

50.     Pollard converted and misappropriated Protected Company Information by removing it from the Company network and placing it on his personal network and then refusing the Company's repeated requests to return it.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

51.     The Company repeats and realleges the allegations in ¶¶ 1-50 as if fully set forth herein.

23

52.     At common law, an officer or manager of a company has a fiduciary duty to act in good faith in dealing with the company, including but not limited to maintaining the confidentiality of the company's confidential, proprietary information and not taking or retaining such information from the company without authorization.

53.     While an Officer and/or manager and having a fiduciary duty to AnMar, Pollard has breached his fiduciary duty by (a) transmitting Protected Company Information to the Personal Accounts and Devices, (b) attempting to camouflage those transmissions, (c) refusing to return the Protected Company Information to the Company, (d) conducting business with the Company's customers and suppliers on his personal network rather than the Company's network, (e) disparaging the Company to its customers and suppliers, (f) refusing to provide the Company with Customer/Supplier Communications, and (g) upon information and belief, conducting business with the Company's customers and suppliers for the benefit of himself and enterprises other than the Company while he remains in the employ of the Company.

## COUNT V
## UNFAIR COMPETITION

54.     The Company repeats and realleges the allegations in ¶¶ 1-53 as if fully set forth herein.

55.     At common law, an employee cannot compete with his employer and a former employee cannot compete with his former employer through wrongful means.

56.     While an employee of the Company, Pollard has engaged in unfair competition with the Company by doing the following: (a) transmitting Protected Company Information to the Personal Accounts and Devices (i) in anticipation of utilizing it on behalf of himself and enterprises other than the Company and (ii) upon information and belief, actually utilizing it on behalf of himself and enterprises other than the Company, (b) attempting to camouflage those

24

transmissions, (c) refusing to return the Protected Company Information to the Company, (d) conducting business with the Company's customers and suppliers on his personal network rather than the Company's network, (e) disparaging the Company to its customers and suppliers, (f) refusing to provide the Company with Customer/Supplier Communications, and (g) upon information and belief, conducting business with the Company's customers and suppliers for the benefit of himself and enterprises other than the Company while he remains in the employ of the Company.

WHEREFORE, the Company prays for judgment and relief as set forth below.

I.      An Order of this Court that requires Pollard to do the following:

A.      Permit a forensic professional engaged by the Company ("Forensic Professional"), using industry best practices, to conduct a forensic examination of the Personal Accounts and Devices to search for and identify Protected Company Information and Customer/Supplier Communications for review subject to a Protective Order.

B.      Permit the Forensic Professional, using industry best practices, to return to the Company and remove from Pollard's possession, custody, or control Protected Company Information and Customer/Supplier Communications.

C.      Provide the Forensic Professional with log in credentials to the Apple iCloud account set up by the Company to permit the Forensic Professional to conduct a forensic examination, using industry best practices, to search for and identify Protected Company Information and Customer/Supplier Communications for review subject to a Protective Order.

D.      Permit the Forensic Professional to remove Pollard's access to the Apple iCloud account set up by the Company.

II.      An Order of this Court that declares that Pollard must fulfill the notice period under the Agreement before separating from the Company and, until conclusion of that notice period, enjoins Pollard from engaging in any activities that are inconsistent with the duty of an employee to his employer, including communications with the Company's customers and suppliers that would be for the benefit of any person or entity other than the Company.

III.     An Order of this Court that declares the date on which Pollard can separate from the Company, including consideration of the provision in ¶ 8 of the Agreement that provides for extension of time periods following violation of any covenant set forth in ¶ 8.

IV.      Compensatory damages, including but not limited to (A) lost profits from diversion of business from the Company resulting from Pollard's conduct, (B) gains wrongly derived by any other person or entity resulting from Pollard's conduct, and (C) lost profits or illicit gains resulting from interference with the Company's relationships with its customers or suppliers.

V.       Repayment to the Company of $96,681.61, which is the sum of money the Company paid to Pollard in excess of the amount required under ¶ 4 of the Agreement, in view of Pollard's breach of his commitment to transition existing gross profit responsibility to other members of AnMar's sales staff.

VI.      Exemplary and punitive damages.

VII.     Attorneys' fees and costs.

VIII.    Such other relief as this Court deems appropriate.

PLAINTIFFS CELLMARK USA, LLC and
ANMAR INTERNATIONAL, LTD.

*/s/ Stephen P. Rosenberg*
Stephen P. Rosenberg (CT26601)
Littler Mendelson, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT 06510
Telephone: 203-974-8700
Facsimile: 203-974-8799
sprosenberg@littler.com

Jedd Mendelson
*Pro Hac Vice Application Pending*
Littler Mendelson, P.C.
One Newark Center, 8th Floor
Newark, NJ  07102
Telephone: 973-848-4700
Facsimile: 973-643-5626
jmendelson@littler.com

Their Attorneys

## VERIFICATION

I, Hugo Galletta, President and Chief Executive Officer of AnMar International Ltd., am the authorized representative of the Company for the purpose of verifying the Complaint. I have personal knowledge of the matters set forth in the Complaint or the information contained therein has been collected and made available to me by the Company. I affirm the factual information and statements made therein are true and correct to the best of my knowledge and belief.

_____
Hugo Galletta

STATE OF CONNECTICUT    )
                             ) ss.:  Shelton, Connecticut
COUNTY OF FAIRFIELD      )

Personally appeared, Hugo Galletta before me and subscribed and swore to the foregoing on this 2d day of April, 2018.

_____
Notary Public / Commissioner of the Superior Court

My Commission Expires:_ 8 - 31 - 2020

```
T KAUDERS
Notary Public
Connecticut
My Commission Expires Aug 31, 2020
```

# EXHIBIT A

**EMPLOYMENT AGREEMENT**

This Agreement is made by and between **CellMark USA, LLC**, a limited liability company organized and existing under the laws of the State of Delaware, with its principal office located at 333 Ludlow Street, Stamford, CT 06902 (hereinafter referred to as "CellMark" or the "Company"), and **Alan J.S. Pollard**, residing at 3 Willow Lane, N. Caldwell, NJ 07006 (hereinafter referred to as "Employee").

In consideration of the covenants and agreements herein contained, the parties hereto hereby agree as follows:

1. <u>Term</u>. Subject to the provisions herein, this Agreement shall commence on the Effective Date (as defined in Paragraph 10 below) and shall continue through August 31, 2018 (the "Initial Term"). The Initial Term of is Agreement will be extended for successive one-year periods (each an "Extended Term" and together with the Initial Term, the "Term") unless and until terminated pursuant to paragraph 6.

2. <u>Duties and Responsibilities</u>. For so long as Employee's employment with the Company continues, the Employee will devote his full business time, attention and best efforts to the affairs of the Company, will faithfully serve the Company, and in all respects conform to and comply with the directions and instructions consistent with his position as Senior Vice President of Sales given to him by CellMark Chemicals' President, or any other executive to whom he reports. Employee shall perform such duties as are customarily performed by one responsible for managing the buying and selling of fine chemical products and such other duties as may be reasonably assigned to him from time to time by the Company.

3. <u>Base Salary</u>. The position is salaried position and therefore an exempt professional job under the federal Fair Labor Standards Act. Among other things, this means that the Employee shall not be entitled to compensation for work in excess of 40 hours per week. The Employee shall receive a semi-monthly base salary of $4,166.67 ($100,000 on an annual basis) starting September 1, 2014. The base salary will be paid according to the Company's normal payroll schedule and subject to appropriate withholdings. For the avoidance of doubt, and notwithstanding any other provision in this Agreement to the contrary, during the period commencing on the Effective Date and ending on August 31, 2014, the Employee shall continue receive the same compensation and benefits as applicable to him on the date immediately preceding the Effective Date.

4. <u>Quarterly Performance Incentive Compensation</u> / Annual Performance Bonus. During the Term of this Agreement, the Employee will be eligible for a Performance Incentive Commission based upon the following calculation:

   1) 8.25% of the Gross Profit of AnMar International Ltd ("AnMar") from $1 to $5,500,000 (five million five hundred thousand US dollars).
   2) 10% of the AnMar Gross Profit in excess of $5,500,000 (five million five hundred thousand US dollars).
   3) The rate in 1) above will decrease by 1% per calendar year for every year during the Initial Term starting in 2015. As an example the rate for September 1, 2014 through August 31, 2015 will be 8.25%; the rate for September 1, 2015 through August 31, 2016 will be 7.25%;

1

the rate for September 1, 2016 through August 31, 2017 will be 6.25%; the rate for September 1, 2017 and thereafter will be 5.25%.

For purposes of this calculation, Gross Profit shall be determined on a consistent basis in accordance with the monthly financial statements of AnMar maintained in the ordinary course of business. "Gross Profit" means net sales made by AnMar less cost of material, less all direct costs including but not limited to freight, duty, handling and storage, production costs other than labor costs, financing, credit insurance, purchase and/ or sales commissions, rebates and bad debt allowances.

Travel and Entertainment ("T&E") business expense for the sales department of AnMar will be provided in an annual budget of up to 1.75% of Gross Profit. Charitable donation business expenses are excluded from the T&E budget. However, all charitable donations require advance approval by CellMark Chemicals' President.   Annual T&E expense in excess of the budget will be deducted from the Performance Incentive Commission payable to the Employee.

The employee will receive an Advance Payment against the Performance Incentive Commission. The Advance Payment shall be paid by AnMar on or before the last day of each calendar month.  The first Commission shall be paid on September 30, 2014.  The Company shall then reconcile quarterly against the actual Performance Incentive Commission earned not later than the 30th day following the end of each quarter or sooner at the Company's discretion for which the Performance Incentive Commission was earned. Any overpayment or underpayment will be subtracted or added respectively against a subsequent Advance Payment.  The initial amount of the Advance Payment will be $30,000 per month and may be adjusted from time to time by the Company.

The Employee will be eligible to receive an annual performance bonus. This bonus will be discretionary and will be based upon the Employee's total contribution to the gross margin of other Chemical Division activities for the fiscal year. The bonus will be payable within 90 days from the end of the fiscal year.

5. <u>Other Benefits</u>.  During the Term of this Agreement the Employee shall be entitled to participate in the then current benefit and welfare plans (including by way of example, Paid Time Off (PTO), 401k savings, profit sharing, Section 125 and Section 129 medical and dependent care savings, medical, dental, life, and disability insurance) according to the terms and conditions of each plan provided to other employees holding the title of senior vice president and having the same seniority as the Employee. To the extent length of service or seniority with the Company affects any eligibility or amount of benefits to which the Employee is entitled, Employee shall be given full credit for past service to and with the Company and nothing in this Agreement shall alter such prior service or seniority of the Employee.

In 2016, the Employee shall be entitled to replace his current AnMar-provided automobile with a Category 1 company car under the Company Car Program.

All Company benefits, welfare plans and policies are subject to change at the sole discretion of the Company and do not require advance notice to Employee.

6. <u>Termination</u>.

A) This Agreement shall automatically terminate upon Employee's death or in the event of mental or physical incapacity preventing Employee from attending to his duties for a period of more than ninety (90) days.

If the Employee's employment is terminated pursuant to Paragraph 6A, the Employee (or his estate, as the case may be) shall be entitled to receive (i) the then applicable base salary compensation and benefits specified in paragraph 3 and 5 up until the date of termination, earned Performance Incentive Commission for a period of [3] months immediately following the date of termination.

B) This Agreement may be terminated by the Company for Cause.  For purposes of this Agreement, Cause shall mean:

    i.   Gross or willful misconduct or gross negligence pertaining to the performance of Employee's duties;
    ii.  Willful disobedience by Employee of directions received from, or policies established by the senior management of the Company, provided such directions or policies are not unlawful, or
    iii. Conviction of the Employee of a crime involving fraud or moral turpitude, or any other act that can be expected to have an adverse effect on the business, reputation or financial condition of the Company.

The Company will determine the existence of Cause in its sole discretion in compliance with all applicable laws.

If the Employee is terminated pursuant to paragraph 6B, the Employee's compensation and benefits cease on termination date.

C) The Company may terminate the employment of the Employee without cause with a written notice of 60 days.

If the Employee's employment is terminated pursuant to paragraph 6C, the Employee will be entitled to receive the then applicable base salary compensation and benefits specified in paragraphs 3 and 5 through the date of termination plus the severance set forth in paragraph 7 below.

D) The Employee may resign employment from the Company without cause with a written notice of 60 days and in that event, the Employee shall only be entitled to the then applicable base salary compensation and benefits specified in paragraphs 3 and 5 up to the effective date of the resignation. The Employee will be eligible for a commission specified in paragraph 4 pro-rated for the year in which his resignation occurs.

7. <u>Severance.</u> If the Employee is terminated without cause pursuant to Paragraph 6C during the Initial Term, employee will be entitled to receive a Severance Payment equal to the greater of the amount calculated pursuant to the terms of the Company Severance Plan, or 1 year of the then applicable base salary and benefits specified in paragraphs 3 and 5 plus an amount equal to 12 months of the Performance Incentive Commission based upon the average of the Performance Incentive Commission earned and received by the Employee received during the 36 calendar months

3

immediately preceding the date of termination. If the Employee is terminated without cause pursuant to Paragraph 6C during the Extended Term, employee will be entitled to receive a Severance Payment pursuant to the terms of the Company Severance Plan.

All Company benefits, welfare plans and policies are subject to change at the sole discretion of the Company and do not require advance notice to Employee.

8. <u>Certain Covenants</u>. Employee understands and acknowledges that the Company and its affiliates use trade secrets and other confidential information in its course of business, including but not limited to information regarding customer and supplier names, addresses and requirements, organizational systems, methods, data, sales figures, projections, plans, personnel and other similar information. In the course of performing his duties on behalf of the Company, Employee will be permitted access to some or all such trade secrets and other confidential information and shall use such information only as required to perform Employee's duties on behalf of the Company and solely for the benefit of the Company and its affiliates. Employee agrees that all such information which has been disclosed to him shall be treated as private, privileged and confidential and that Employee shall not disclose or release any of such information in any way to any person, firm or institution at any time during Employee's employment by CellMark or after any termination of said employment, whether termination is voluntary or involuntary. Employee further agrees that upon termination of Employee's employment with CellMark, whether termination shall be voluntary or involuntary, Employee shall cease using the all such trade secrets and other confidential information and shall surrender to the Company any lists, books, records, indices, notes, files, papers, documents or materials of whatever kind or nature which refer or relate in any way to the Company or the business of CellMark. Notwithstanding the foregoing, confidential information shall not mean or include information that is or becomes generally available to the public other than as a result of a disclosure by the Employee in violation of this Agreement,

Employee agrees that for a period of eighteen (18) months following the expiration of his employment, he will not, on behalf of himself or as an employee of any person, firm or corporation dealing in the sales of Fine Chemical Products, call on or solicit in any manner any customer of the Company or its affiliates with which Employee and his staff has had any dealing of any kind or upon whom Employee or his staff called during the course of Employee's employment by the Company for the purpose of selling Fine Chemical Products. For purposes of this paragraph 8, "Fine Chemical Products" shall be defined to mean those products sold by the Company during the course of Employee's employment.

Employee further agrees that during his employment with the Company and for a period of one year following the termination of said employment, whether termination is voluntary or involuntary, and regardless of the reason of said termination, he will not, on behalf of himself or on behalf of any other person or corporation, solicit any employee of the Company or its affiliates to leave the employ of the Company to become employed by any person or corporation engaged in competition with the Company.

Employee further acknowledges receipt of adequate consideration for the covenants set forth in this paragraph 8 and that the time period, territory and scope of the activities proscribed in this paragraph 8 describe the reasonable limitation on the time and scope of activities necessary to protect Company and its affiliates. Employee acknowledges and agrees that monetary damages cannot compensate the Company in the event of a violation of any of the foregoing covenants.



4

Accordingly, you agree that in the event of a violation or breach of any covenant set forth in this paragraph 8, Company may institute any action or proceeding to enforce such covenant at law or in equity, including injunctive relief and specific performance, and Company shall be entitled to recover all costs and attorneys' fees incurred by it in connection with any successful action or proceeding to enforce such covenant. In the event that there shall be any violation of any covenant set forth in this paragraph 8, then the applicable time limitation thereof shall be extended for a period of time equal to the period of time during which such violation continues; and in the event the Company is required to seek relief from such violation in any court, board of arbitration or other tribunal, then the covenant shall be extended for a period of time equal to the pendency of any such proceedings, including all appeals. In the event that the Company initiates an action and fails to prove a breach has occurred, the Employee shall be entitled to recover all costs and attorney fees incurred by it in connection with this matter.

9. <u>Severability</u>. It is the intention of the parties that the terms and provisions herein be construed to be separable and severable. If any term or provision of this AGREEMENT shall be held void, illegal, unenforceable, or in conflict with any applicable law, all other terms and provisions shall remain valid and fully enforceable. Further, in the event that a court of competent jurisdiction determines that any provision or term of any restrictive covenant contained herein is unreasonably broad and thereby unenforceable in any respect, it is the parties' desire and intention that the court reforms such provision or limit the scope of said provision or term as to render it reasonable and enforceable.

10. <u>Effective Date.</u> This Agreement shall be effective only in the event of, and from and after such time as, (a) consummation of the sale (the "Effective Date") of 100% of the issued and outstanding common stock of AnMar International Ltd., a corporation organized and existing under the laws of the State of Delaware ("AnMar") to CellMark pursuant to the terms of the Stock Purchase Agreement among CellMark and each of the shareholders of AnMar (the "Sale Transaction"), and (b) Employee and AnMar execute and deliver on the Effective Date a Mutual General Release in the form attached hereto (the "Release"). For the avoidance of doubt, if for any reason the Sale Transaction is not consummated and /or the Release is not executed and delivered, this Agreement shall not become effective and shall be of no force or effect.

11. <u>Assignment</u>. Immediately and automatically upon consummation of the Sale Transaction, this Agreement shall be deemed to be assigned to and assumed by AnMar without need for further action by either CellMark or AnMar. Employee hereby irrevocably consents to such assignment to and assumption by AnMar and agrees that this Agreement shall replace and supersede in its entirety any other then-existing agreement between AnMar and the Employee. For the avoidance of doubt, at such time as the assignment takes place all references in this Agreement to "CellMark" or the "Company" shall be deemed to be substituted and replaced by "AnMar" and all benefits referenced in paragraph 5 above shall be those then, or at any time thereafter during the Term of this Agreement, provided by AnMar. This Agreement binding upon and shall inure to the benefit of the parties hereto and the respective successors and assignees of CellMark (including AnMar as contemplated by this paragraph 11), but shall not be assignable by or on behalf of Employee.

12. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws and not the conflicts of law rules of the State of Connecticut without presumption or construction against the party preparing it. Any disputes under this Agreement shall be adjudicated in the federal or state courts located in the State of Connecticut.

13. <u>Entire Agreement and Amendment</u>.  This Agreement contains the entire understanding of Company and the Employee and may not be amended except by a written instrument signed by both parties.

IN WITNESS OF THE FOREGOING, the parties have executed or caused this Agreement o be executed on the date first written above.

Employee                                              CellMark USA, LLC

Alan J.S. Pollard                                     Hugo Galletta
Date __Dec 29th 2014__                                President & Chief Executive Officer

6