UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CELLMARK USA, LLC and | : | Civil Action No.:  3:18-cv-00551-JCH |
| ANMAR INTERNATIONAL LTD., | : | |
| Plaintiffs, | : | |
| v. | : | |
| ALAN POLLARD, | : | |
| Defendant. | : | |
| | : | |
| | : | April 6, 2018 |
| | : | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR ORDER TO SHOW
CAUSE SEEKING TEMPORARY RESTRAINTS AND PRELIMINARY INJUNCTION**

Stephen P. Rosenberg (CT26601)
Littler Mendelson, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT 06510
Telephone: 203-974-8700
Facsimile: 203-974-8799
sprosenberg@littler.com

Jedd Mendelson
*Pro Hac Vice Application Pending*
Littler Mendelson, P.C.
One Newark Center, 8th Floor
Newark, NJ  07102
Telephone: 973-848-4700
Facsimile: 973-643-5626
jmendelson@littler.com

Attorneys for Plaintiffs CellMark USA, LLC
and AnMar International Ltd.

TABLE OF CONTENTS

PAGE

I.      PRELIMINARY STATEMENT ........................................................................... 1

II.     STATEMENT OF FACTS .................................................................................. 1

III.    ARGUMENT ..................................................................................................... 7

        A.      Legal Standard for Temporary Restraints and Preliminary Injunction.................. 7

        B.      The Company Has Suffered, and Will Continue to Suffer, Irreparable
                Harm in the Absence of Issuance of Temporary Restraints and Injunctive
                Relief....................................................................................................... 8

        C.      The Harm to the Company Outweighs Any Potential Harm to Pollard .............. 10

        D.      The Company is Likely to Succeed on the Merits of its Claims ........................ 12

                1.      Breach of Contract ....................................................................... 12

                2.      Violation of Duty of Loyalty ......................................................... 14

                3.      Misappropriation and Conversion................................................... 15

                4.      Breach of Fiduciary Duty.............................................................. 17

                5.      Unfair Competition ...................................................................... 18

        E.      The Court Should Extend the Contractual Notice Period Beyond April 20
                if  Discovery Indicates that Pollard has Breached Any Covenants in ¶ 8 of
                the Agreement ......................................................................................... 19

IV.     CONCLUSION................................................................................................. 21

Plaintiffs CellMark USA, LLC ("CellMark") and AnMar International, Ltd. ("AnMar"), together "Company", submit this Memorandum of Law in Support of their Motion for Order to Show Cause seeking Temporary Restraints and a Preliminary Injunction against Defendant Alan Pollard ("Pollard").

## I.   PRELIMINARY STATEMENT

The Company has brought this action against Pollard because he has, among other things, misappropriated the Company's confidential and proprietary information and/or trade secrets ("Protected Company Information"), refused to return the Protected Company Information, and failed to fulfill the 60-day notice period for which his Employment Agreement provides after he resigned without cause.  Over the past 5 to 6 weeks, the Company has repeatedly endeavored, but failed, to secure return of its Protected Company Information and persuade Pollard to refrain from separating from employment until his notice period concludes on April 20, 2018.  Pollard's conduct violates his Employment Agreement and certain common law duties.   Pollard's precipitous and premature separation from the Company with thousands of pages of Protected Company Information in his possession, custody, or control necessitates issuance of temporary restraints and preliminary injunctive relief in order to prevent Pollard from disclosing or exploiting this sensitive business information in competition with the Company when he has not yet exhausted the notice period under his Employment Agreement and remains an employee of the Company.

## II.   STATEMENT OF FACTS

The facts are set forth in detail in the Verified Complaint.  The Company underscores certain points below because they are central to the instant application.

CellMark acquired AnMar in September 2014 (Complaint, ¶ 3[a]).  A key component of the Company's general business plan for the combined enterprises was that Pollard, who was

AnMar's senior sales executive and a Company officer, would transition his existing gross profit responsibility to other AnMar sales team members and concentrate his attention on developing new customers and new business through the sale of new products to existing customers (Complaint, ¶ 8[e]). The commission structure in ¶ 4 of Pollard's Employment Agreement ("Agreement"), which was executed in anticipation of the acquisition (Complaint, ¶ 12[b]), was premised on this transition of gross profit responsibility taking place while providing upside earning potential to Pollard if he succeeded in developing new business and growing AnMar's gross margin in excess of $5.5 million. In other words, Pollard's commission is based upon the performance of AnMar overall and, in particular, AnMar's sales staff. It is not grounded in any individual performance metrics for Pollard alone. (Complaint, ¶ 8)

At the beginning of November 2017, the Company's senior management took a hard line with Pollard because after 3 years he had continued to flout the Company's business plan (Complaint, ¶¶ 12-13). He had neither meaningfully transitioned existing gross profit responsibility to other sales team members nor focused on developing new customers and new business from existing customers (Complaint, ¶ 12). Moreover, senior management learned that in October 2017, Pollard had disparaged the Company to several of its customers in the presence of Company employees (Complaint, ¶ 11). In November 2017, the Company's senior management met with Pollard, issued Company Directives that provided specific direction and timetables for execution of the Company's general business plan objectives, and admonished that his failure to comply with the Company Directives could result in discipline up to and including discharge (Complaint, ¶ 12[c]-[e]). Among the measures that the Company required of Pollard was that he refrain from making disparaging remarks in public about the Company and its employees (Complaint, ¶ 12[a]).

2

By mid-January 2018, it was apparent that Pollard was continuing to resist senior management's direction, including the Company's Directives (Complaint, ¶ 16).  Furthermore, the Company learned that Pollard had orchestrated communications from certain customers (going so far as to provide them with a template) expressing concern and complaining to the Company about the change in Pollard's responsibilities (Complaint, ¶ 16[a]).  In Pollard's performance review, the Company's President and CEO, Hugo Galletta, memorialized Pollard's continuing resistance and failures (Complaint, ¶ 16).  Galletta also issued a Final Warning Notice to Pollard that detailed his deficiencies and once again advised that he faced discipline, including possible discharge, unless he overcame these deficiencies and implemented the Company Directives (Complaint, ¶ 16).  Among the measures that the Company required of Pollard was that he advise the customers he had encouraged to write to the Company on his behalf that his remarks had been in error and that the other members of the sales team assigned to service them were quite capable of taking care of their needs (Complaint, ¶ 16[e]).

In mid-February 2018, senior management learned that Pollard had been forwarding Protected Company Information to personal email accounts belonging to his wife and himself ("Personal Accounts and Devices") and deleting many (though not all) of the emails in which he had done this from his "sent" folder (Complaint, ¶ 17).  Under the Company's Information Technology Security and Usage Directives for End Users ("Company IT Policy"), personnel are precluded from removing Protected Company Information from the Company's network and conducting business with customers and suppliers through other than the Company's network (Complaint, ¶ 18[d]).  In view of the knowledge it had acquired about Pollard's policy violations, the Company placed Pollard on administrative leave without salary pending investigation.

The Company commenced an investigation and learned that Pollard had been violating the Company IT Policy and the confidentiality provisions in ¶ 8 of his Employment Agreement by sending Protected Company Information to the Personal Accounts and Devices since the acquisition (Complaint, ¶ 17). Notably, however, there had been a significant spike in such activity (1) in 2017 relative to 2016 and (2) in particular, since the Company had hardened its stance with Pollard in November 2017 (Complaint, ¶ 17[b]-[i]):

- Pollard sent 400% more emails, most of which had attachments, to the Personal Accounts and Devices in 2017 than 2016. [He sent 1903 such emails in 2017 versus 476 such emails in 2016.]

- During the 3.5 month period between November 2017 and mid-February 2018, Pollard forwarded 225% more emails to the Personal Accounts and Devices than he had transmitted for all of 2016. [He sent 1075 such emails between 11/17 and 2/18 versus 476 such emails in all of 2016.]

- In 2016, Pollard deleted no emails sent to the Personal Accounts and Devices from his "sent" folder. In 2017, Pollard deleted approximately 19% of these emails from his "sent" folder. Between November 2017 and mid- February 2018, Pollard deleted almost 39% of these emails from his "sent" folder.

The data was eye-opening and strongly suggested Pollard was misappropriating the Protected Company Information for disclosure and use other than for the Company's benefit and other than through the Company's network. This was even more disturbing--indeed, ominous-- in view of the indisputable reality that Pollard works principally from his home (Complaint, ¶ 18[b]): simply put, Pollard had transferred data to make it possible to communicate with Company customers and suppliers from his personal network (and beyond the Company's oversight) from the very same home office where he had been doing business with them on the Company network (Complaint, ¶ 31[c]).

Having ascertained the above, the Company requested that Pollard provide consent and log in credentials to an Apple iCloud account it had set up that was connected to the Company-

issued email account, iPad, and iPhone that the Company had provided to Pollard (Complaint, ¶ 18[g]). The Company had directed Pollard to return to it his Company-issued laptop, iPad, and iPhone so that it could examine his devices and data (Complaint, ¶ 18). When Pollard did so, he returned the iPad and iPhone reset to factory settings (Complaint, ¶ 18[f]). Doing so had the effect of wiping all or almost all data on those devices. By Pollard providing consent to examine the Apple iCloud account and his log in credentials, the Company would have an opportunity to recover the data from the iPad and iPhone that Pollard had wiped, though the Company communicated to Pollard that its ability to recover that data was time-sensitive (Complaint, ¶¶ 27[e], 28[a]). The Company also asked Pollard to meet with its representatives to answer questions the Company had about Pollard's conduct (Complaint, ¶¶ 28[d], 29[c]).

To the Company's dismay, Pollard repeatedly and steadfastly refused to provide consent and log in credentials for the Company to access the Apple iCloud Account (Complaint, ¶¶ 18[g], 26[d], 29[b]). Pollard also rejected the invitation to interview with the Company (Complaint, ¶ 29[c]). Pollard's resistance to these reasonable requests seeking cooperation with the Company's investigation strongly suggested that Pollard's interests were not aligned with those of the Company and that he was consciously obstructing the Company's investigation (Complaint, ¶ 18[h]).

On February 20, 2018, Pollard informed the Company that he was resigning and that March 2, 2018 would be his last day of employment (Complaint, ¶ 19). The Company provided Pollard with ample opportunity to reverse course and continue in its employ (Complaint, ¶¶ 20-23). Pollard rejected each such overture. Accordingly, on March 1, 2018, the Company informed Pollard that it understood that he intended to separate (Complaint, ¶ 24[a]). The Company then advised Pollard that he was obligated to submit to a forensic examination of the

5

Personal Accounts and Devices so that the Company can identify and recover its Protected Company Information (Complaint, ¶ 31[a]).  It also pointed out that under Paragraph 6(D) of his Employment Agreement, which pertains to a resignation without cause, Pollard was obligated to provide 60 days' notice before separating (Complaint, ¶ 24[b]).  The Company stated that his February 20 notification meant that he could not separate until April 20, 2018.  It has also since informed Pollard that since Paragraph 8 entitles the Company to extend the time period of any restriction, in the event he has conducted himself unfaithfully while in its employ, the Company will maintain that the notice period is extended beyond April 20 for so long as necessary to ensure that the Company receives the benefit of the 60 day notice period.

On March 14, Pollard's attorney wrote to the Company that Pollard "ha[d] no need for [Protected Company Information] at this time" (Complaint, ¶ 29[a]).  On March 22, Pollard's attorney reiterated that Pollard "does not want [Protected Company Information] or need it" (Complaint, ¶ 33).  Despite those declarations, Pollard continued to refuse to agree to a forensic examination enabling the Company to secure a return of the Protected Company Information and its destruction/elimination from the Personal Accounts and Devices.

In view of Pollard's failure and refusal to submit to a forensic examination, provide the Company with consent and log in credentials to examine the Apple iCloud account, and comply with his obligation to await the passage of 60 days from his resignation notice before separating, the Company commenced this action and now seeks temporary restraints and preliminary injunctive relief to stop and undo these wrongful acts as well as foreclose them from recurring. The Company further requests expedited discovery so that it can determine, among other things, whether Pollard is already doing business with the Company's customers and suppliers while still a Company employee and officer  in breach of his duties of loyalty and fiduciary duty as

6

well as his contractual obligations. Indeed, in the day or two immediately preceding this application's filing, as set forth in the Affidavit of Hugo Galletta that counsel hurriedly prepared just prior to filing, the Company has learned information that strongly suggests Pollard has begun competing during his notice period.

## III.   ARGUMENT

### A.   Legal Standard for Temporary Restraints and Preliminary Injunction.

Rule 65 of the Federal Rules of Civil Procedure establishes the legal standard that governs issuance of a preliminary injunction and, pending the determination as to whether it should issue, the grant of a temporary restraining order. *See, e.g., Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) ("The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction.").

To obtain a preliminary injunction, the moving party must show (1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the moving party. *E.g., Citigroup Global Markets, Inc. v. VGC Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010); *MacDermid, Inc. v. Selle*, 535 F. Supp. 2d 308, 315 (D. Conn. 2008). Courts in the Second Circuit consider the same factors when deciding whether to grant an application for a temporary restraining order. *E.g., Maxum Petroleum, Inc. v. Hiatt*, No. 3:16-cv-01615 (VLB), 2016 U.S. Dist. LEXIS 133714, at *3 (D. Conn. Sept. 28, 2016); *Neopost USA, Inc. v. McCabe*, No. 3:11-cv-1369 (CSH), 2011 U.S. Dist. LEXIS 105850, at *9-10 (D. Conn. Sept. 19, 2011).

**B.      The Company Has Suffered, and Will Continue to Suffer, Irreparable Harm in the Absence of Issuance of Temporary Restraints and Injunctive Relief.**

It is well-settled under Connecticut law that the breach of a restrictive covenant establishes irreparable harm and the absence of an adequate legal remedy.   No independent showing of "irreparable harm" is required because such harm is presumed.  *See, e.g., Westport Res. Mgmt. v. DeLaura*, No. 3:16-cv-873 (VAB), 2016 U.S. Dist. LEXIS 81586, at *11 (D. Conn. June 23, 2016) (stating that "numerous" state and federal courts in Connecticut "have held that irreparable harm may be assumed in cases where the plaintiff alleges a breach of a restrictive covenant"); *Hartford Elec. Light Co. v. Levitz*, 173 Conn. 15, 22 (1977) ("A restrictive covenant may be enforced by injunction without a showing that violation of the covenant will cause harm to the plaintiff, so long as such relief is not inequitable.")

The Company has suffered, and will continue to suffer, irreparable harm through Pollard's misappropriation of the Company's Protected Company Information.   "In general, a breach of a restrictive covenant involving the disclosure of proprietary information will satisfy the requirement that plaintiff establish irreparable harm in the absence of an injunction." *United Rentals (N. Am.), Inc. v. Myers*, No. 3:03-cv-589 (PCD), 2003 U.S. Dist. LEXIS 25287, at *10 (D. Conn. Apr. 11, 2003) (citing *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)). "Owing to the demonstrated value of preventing public disclosure of the confidential and proprietary information at issue in this case," the Company "likely will suffer irreparable harm absent relief and . . . the balance of hardship tips in its favor." *MacDermid*, 535 F. Supp. 2d at 317; see, e.g., *Entegee, Inc. v. Korwek*, No. 3:15-cv-1087 (VLB), 2015 U.S. Dist. LEXIS 118263, at *18-19 (D. Conn. Sep. 4, 2015) (irreparable harm established where, "[g]iven the detailed and sensitive nature of the information [defendant] took with him, its use and dissemination to third parties cannot but erode the goodwill [plaintiff] has developed with these

8

individuals and entities and result in the loss of client relationships); *Advantage Tech. Res., Inc. v. Guinn*, No. HHD-CV-126-029208S, 2012 Conn. Super. LEXIS 1031, at *5 (Apr. 17, 2012) (irreparable harm established where plaintiff's downloading of confidential information shortly before his resignation revealed "an intent in using that information at some future time" in "a way that would prejudice [the employer's] future business interests").

At the present time, there is no way to ascertain the loss that the Company will sustain as a result of Pollard failing to comply with his notice period and commencing competitive activity on behalf of himself and one or more other enterprises utilizing the Protected Company Information that he transferred from the Company network to the Personal Accounts and Devices. Pollard has heightened the uncertainty surrounding the situation by:

- destroying data on the Company-issued iPad and iPhone,

- refusing to provide the Company with consent and log in credentials to attempt to recover destroyed data from the Apple iCloud account that it set up despite the Company advising that recovery of that data could very well be time-sensitive,

- refusing to agree to the intervention of a forensic professional to identify the Protected Company Information and communications with Company customers and suppliers on Pollard's personal network and secure their return,

- disparaging the Company and its employees to customers while also asking customers to complain to the Company on his behalf and failing to take steps upon which the Company insisted to undo the damage already wrought through his ill-advised, disparaging remarks to those customers.

The damage to the Company's good will with its customers and suppliers is also impossible to gauge as a result of Pollard's obfuscation since forwarding his February 20 resignation notice. The Company's attempts to convince Pollard to comply with his notice obligation were earnest but futile and during their pendency there is every reason to believe he was communicating with customers other than on behalf of the Company given his previous negative portrayal of the Company to them. In view of Pollard's refusal to respect his notice

period, the circumstances are that much more aggravated since Pollard is very likely competing with the Company at the same time he remains in its employ.

The Company is likely to continue to suffer irreparable harm if restraints and injunctive relief do not issue.  It is precisely the impracticability of assessing the monetary value of such harm that renders the harm irreparable and warrants the imposition of restraints and injunctive relief to enforce Pollard's contractual and common law obligations.

### C.    The Harm to the Company Outweighs Any Potential Harm to Pollard.

While the Company will suffer significant, irreparable injury absent the Court's exercise of its equitable powers, Pollard will not suffer any irreparable hardship from the imposition of restraints and preliminary injunctive relief.  At the outset, all that the Company is seeking is an Order that requires Pollard to (1) comply with his contractual notice period, (2) provide the Company with access to the Apple iCloud account to recover Company data that he has admitted destroying, and (3) submit to a forensic examination that will identify Protected Company Information and communications with customers and suppliers on the Personal Accounts and Devices so that (a) the Protected Company Information is returned to the Company and (b) competitive activities in which Pollard engaged can be identified and the Court can determine with greater particularity the equitable relief to which the Company is entitled, including whether the Court should extend the notice period consistent with the language in ¶ 8 of the Agreement in view of Pollard's refusal to honor it.

This limited application of the Company at this stage seeks only to vindicate legitimate interests.  The requested relief is consistent with that ordered for similar unfair and disloyal actions.  *See, e.g., Westport Res. Mgmt.*, 2016 U.S. Dist. LEXIS 81586 at *15 (granting temporary restraining order requiring defendant to, *inter alia*, return plaintiff's confidential documents and information within 24 hours); *Entegee, Inc.*, 2015 U.S. Dist. LEXIS 118263 at

*11 (injunction granted where defendant's misappropriation of confidential information "raised a considerable risk of undermining" plaintiff's goodwill in the marketplace); *Advantage Tech. Res., Inc.*, 2012 Conn. Super. LEXIS 1031 at *9 (granting temporary injunction requiring defendant to, *inter alia*, return employer's confidential documents and information, allow employer to examine forensically the personal email account to which defendant had forwarded such information, and sign an affidavit under oath to verify the extent of his use of the information and to certify that he had returned all such information to the employer); *Genworth Fin. Wealth Mgmt. v. McMullan*, 721 F. Supp. 2d 122, 131 (D. Conn. 2010) (granting a preliminary injunction prohibiting former employee defendants from utilizing former employer's customer information and client lists).

The possibility of harm to Pollard from issuance of the requested relief is minimal in comparison to the irreparable harm that the Company is suffering from Pollard's violations    of his contractual obligations and the pernicious and irrevocable negative impact their continuation will have on the Company's relationships with its customers.  Indeed, Pollard acknowledged and agreed in ¶ 8 of his Agreement "that monetary damages cannot compensate the Company in the event of a violation of any of the foregoing covenants," and that the Company "may institute any action or proceeding to enforce such covenant at law *or in equity, including injunctive relief and specific performance . . . .*"  (Complaint, Exhibit A)(emphasis added).  Pollard's agreement to that effect should be "viewed as an admission by [him] that [the Company] will suffer irreparable harm" were he to breach any of the covenants.  *Westport Res. Mgmt.*, 2016 U.S. Dist. LEXIS 81586 at *11 (internal quotation marks omitted), *quoting Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999).  There can be little, if any, harm to Pollard "from an injunction that merely enforces contractual obligations to which he consented," because he had ample

notice of the Agreement's terms and he could have avoided these proceedings simply by not violating the Agreement. *Advantage Tech. Res., Inc.*, 2012 Conn. Super. LEXIS 1031 at *7.

    **D.**    **The Company is Likely to Succeed on the Merits of its Claims.**

        **1.**    **Breach of Contract**

It is indisputable that Pollard has committed several contract breaches with far-ranging consequences.

Pollard failed to comply with his 60 day notice obligation under ¶ 6(D) of the Agreement by stating unequivocally--and declining the Company's repeated efforts thereafter to allow him to reverse course--that he was separating from the Company as of March 3 even though he cannot separate until April 20. It follows that Pollard further violated his Agreement by purporting to separate from the Company without first returning the Protected Company Information that he misappropriated in violation of the Company's rules against removing such information from the Company network. Insofar as Pollard has communicated with Company customers and suppliers on behalf of any person or entity other than the Company prior to April 20, he has breached his contractual duty to refrain from advancing the interests of any person or entity other than the Company. Competition directed against an employer while still in its employ is as grave a contractual breach as exists. *See Elm City Cheese Co. v. Federico*, 251 Conn. 59, 69 (1999) (stating that an employee's duty not to use his employer's confidential information, for his own benefit or that of a competitor, exists both during and after employment); *see also Entegee, Inc*, 2015 U.S. Dist. LEXIS 118263 at *10 (enforcing restrictive covenant to protect employer's legitimate business interest in "safeguarding the goodwill that an employer has acquired through its dealings with customers, as well as its confidential data and trade secrets," where defendant's retention of confidential information and data "raised a considerable risk of undermining plaintiff's goodwill in the market"); *Advantage Tech. Res.,*

*Inc.*, 2012 Conn. Super. LEXIS 1031 at *3 (granting temporary injunction enforcing restrictive covenants which defendant violated by, *inter alia*, sending confidential information to his personal email address while still employed by plaintiff).  Courts enforce notice periods and provide relief for their breach.  *E.g.*, *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 184-86 (S.D.N.Y. 2011)(court granted summary judgment in favor of employer against employee for failing to provide 30 days' notice of resignation required by employment agreement); *Benfield, Inc. v. Moline*, No. 04-3513 (MJD/SRN), 2006 U.S. Dist. LEXIS 6978, at *19-21 (D. Minn. Feb. 22, 2006)(court denied summary judgment application of employees against employer because employees failed to provide contractually required 30 days' notice of resignation).

Embedded in the above conduct but warranting separate mention is Pollard's violation of the Agreement by his initial transmission of Protected Company Information to the Personal Accounts and Devices.  He failed to satisfy his contractual obligation to return the Protected Company Information, as indicated above, because he violated the Agreement in the first instance by misappropriating it, i.e., transmitting it to his and his wife's personal email accounts even though his Agreement recognized that certain Company business information is "private, privileged and confidential and that [he] shall not disclose or release any of such information in any way to any person, firm or institution at any time during [his] employment" (Complaint, Exhibit A, ¶ 8).  The heinous character of Pollard's conduct is underscored by the realization that what he did was remove Protected Company Information from the Company's network and place it on his personal network on the supposed basis that doing so facilitated him performing his duties.  The absurdity of the supposed explanation is that Pollard worked from his home; therefore, he transferred a couple of thousand emails and attachments so that he could access them from his personal network rather than the Company network while sitting in the home

13

office that the Company set up for him in which he earned many hundreds of thousands of dollars annually. The treachery of Pollard's conduct cries out for immediate and effective relief.

### 2.     Violation of Duty of Loyalty

Under Connecticut law, an employee has a duty of loyalty to his employer. *Charter Oak Lending Group, LLC v. August*, 127 Conn. App. 428, 441-42 (2011). Connecticut courts have long defined that duty as follows:

> The law is well settled that knowledge acquired by an employee during his employment cannot be used for his own advantage to the injury of the employer during the employment; and after the employment has ceased the employee remains subject to a duty not to use trade secrets, or other confidential information which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer.

*Allen Mfg. Co. v. Loika*, 145 Conn. 509, 514 (1958); *accord Tourmaline Ptnrs., LLC v. Monaco*, No. 3:13-cv-108 (VAB), 2016 U.S. Dist. LEXIS 181893, at *21 (D. Conn. Feb. 16, 2016); *Elm City Cheese Co.*, 251 Conn. at 69; *Town & Country House & Home Serv., Inc. v. Evans*, 150 Conn. 314, 317 (1963). Simply put, the duty of loyalty "includes the duty not to disclose trade secrets or other confidential information." *OneBeacon Prof'l Ptnrs., Inc. v. Ironshore Holdings, Inc.*, No. HHD-X04-CV085019642S, 2009 Conn. Super. LEXIS 507, at *7-8 (Feb. 27, 2009).

Pollard breached his duty of loyalty in numerous respects. He removed Protected Company Information from the Company's network by transmitting it to the Personal Accounts and Devices and sought to camouflage his wrongful conduct by deleting emails that did so from his "sent" folder.

When the Company asked Pollard to cooperate with it in taking steps to identify the Protected Company Information on the Personal Accounts and Devices in anticipation of its possible return, he repeatedly refused those requests. The Company fully addressed his purported excuse--a supposed concern about invasion of the privacy of his wife and himself--

14

with assurances that a forensic professional would utilize best industry practices to ensure that no private information would be provided to the Company.  (Pollard asserted the supposed privacy concern without regard for the fact that it was he and no one else that had mixed the Protected Company Information with any personal information giving rise to the problem in the first place.)

Pollard also maintained that he transferred the Protected Company Information to the Personal Accounts and Devices for the purpose of communicating with Company customers and suppliers from his personal network.  To the extent such communications continued after March 2, Pollard violated his duty of loyalty to the Company by doing business with Company customers and suppliers on behalf of persons and entities other than the Company.  *See Charter Oak Lending Group, LLC*, 127 Conn. App. at 441 (holding that duty of loyalty may be violated when employee engages in self-dealing during employment, such as misappropriating his employer's confidential information).  As indicated above in Point D(1), this kind of wrongful conduct is quite grave because of the deleterious and lasting impact it is likely to have on the Company's customer relationships.  Coupled with Pollard's disparaging comments about the Company to its customers, which itself violated his duty of loyalty, Pollard's conduct necessitates this Court's immediate intervention to protect the Company from irreparable harm.

### 3.    Misappropriation and Conversion

Under Connecticut law, an employee misappropriates a company's confidential or proprietary business information by taking or retaining such information without authorization.  *See Smith v. Snyder*, 267 Conn. 456, 462 (2004) (affirming trial court's determination that defendant "violated the common-law theory of misappropriation of nontrade secret property by using fraudulent means to misappropriate" confidential information); *see also Laura Laaman & Assocs., LLC v. Davis*, No. 3:16-CV-00594 (MPS), 2017 U.S. Dist. LEXIS 194175, at *28-29

15

(D. Conn. Nov. 27, 2017) (referencing common law tort of misappropriation of confidential information under *Smith v. Snyder*); *Charter Oak Lending Grp., LLC*, 127 Conn. App. at 430-31 (reversing dismissal of claims for misappropriation of proprietary and confidential information).

Similarly, under Connecticut law, an employee converts the property (here, protectable commercial information) by, without authorization, assuming and exercising ownership over the property to the exclusion of the owner's rights. *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 770 (2006); *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 44 (2000); *accord Milso Indus. Corp. v. Nazzaro*, No. 3:08-cv-1026 (AWT), 2012 U.S. Dist. LEXIS 123999, at *29-30 (D Conn. Aug. 30, 2012).

Pollard's lapses with respect to Protected Company Information and Customer/Supplier Communications, including his transfer of it from the Company network to the Personal Accounts and Devices as well as his refusal to cooperate with the Company in identifying it and establishing a basis for its return, makes clear that he committed these torts.

Finally, it is noteworthy that in communications on March 14 and 22, Pollard's lawyer indicated that Pollard neither needs nor has use for the Protected Company Information. The assertion is startling in view of the intensive effort that Pollard undertook to (1) transfer the Protected Company Information from the Company network to the Personal Accounts and Devices and (2) conduct business with Company customers and suppliers from his personal network outside the Company's oversight. Nonetheless, in view of Pollard's declaration that he has no need for the writings that he misappropriated, he should have no objection to an Order from this Court directing him to submit to a forensic examination that results in the return to the Company of its confidential business information and any communications between Pollard and the Company's customers and suppliers that took place both before his resignation notice and

16

during the notice period.

### 4.      Breach of Fiduciary Duty

Under Connecticut law, an employee has a fiduciary duty to his employer with respect to matters within the scope of his employment. *E.g., Tourmaline Ptnrs., LLC,* \2016 U.S. Dist. LEXIS 18193 at *21-22; *Charter Oak Lending Grp., LLC*, 127 Conn. App. at 441. Beyond that, a corporate officer has fiduciary status and a resulting heightened duty to discharge his obligations to the corporation loyally and faithfully. *See, e.g., OneBeacon Prof'l Ptnrs., Inc. v. Ironshore Holdings, Inc.*, No. HHD-X04-CV085019642S, 2009 Conn. Super. LEXIS 507, at *7 (Feb. 27, 2009) (stating as a matter of law that an employee holding an officer or managerial position owes fiduciary duty to his employer); *Risdon-AMS (USA), Inc. v. Levine*, No. CV030181029S, 2004 Conn. Super. LEXIS 580, at *2-3 (Feb. 10, 2004) (defendant owed fiduciary duties to employer by virtue of his position as a vice president).[1]

In this case, the Company reposed its trust and confidence in Pollard, who was obliged as a fiduciary "to exercise the utmost good faith, loyalty and honesty toward" the Company. *OneBeacon Prof'l Ptnrs.*, 2009 Conn. Super. LEXIS 507 at *7. By virtue of his fiduciary duties to the Company, *Pollard has the burden of proving by **clear and convincing evidence** that he did not* breach those duties. *E.g., Risdon-AMS (USA), Inc.*, 2004 Conn. Super. LEXIS 580 at *4 (citing *Konover Dev. Corp. v. Zeller*, 228 Conn. 206, 229-30 (1994)). Pollard cannot meet his burden of proof. Through his wrongful conduct, Pollard breached his fiduciary duties as an employee and, even more, as the senior sales executive for AnMar responsible for supervising

---

[1]      The law is clear, however, that an officer or managerial position is not required in order for fiduciary duties to attach, provided that "there is a justifiable trust confided [by the employer] and a resulting superiority and influence [by the employee] on the [employer]." *Tourmaline Ptnrs., LLC*, 2016 U.S. Dist. LEXIS 18193 at *19-20 (internal quotation marks omitted); *see, e.g., id.* at *21 (business development director was a fiduciary where he "consented to and did act on [the employer's] behalf and subject to its control" and the employer "entrusted [him] with confidential information concerning its clientele and operations"); *Mec-Gar v. Hard*, No. CV-020077396S, 2002 Conn. Super. LEXIS 3314, at *8 n.3 (Oct. 2, 2012) (concluding that employee whose job title was vice president and general manager owed fiduciary duties regardless of whether he was an officer).

the sales staff team members.

Pollard is also an officer of the Company.  Although he requested that the Company remove his officer status in November 2017, some of the wrongful conduct that has taken place predated that request.  Moreover, in early January 2018, Pollard continued to insist that he retain his status as a Senior Vice President.  That insistence constituted a *de facto* rescission of his demand that the Company remove his officer status.  Accordingly, Pollard engaged in the wrongful conduct that is the subject of this lawsuit as a Company officer.  In doing so, he violated the heightened duty to execute his responsibilities faithfully and loyally as a corporate officer.

### 5.      Unfair Competition

Connecticut law recognizes a common law cause of action for unfair competition, which applies when, inter alia, an employee's bad faith competitive actions cause harm to his employer's or his former employer's business. *E.g., Krall Coal & Oil Co. v. Gambardella*, No. CV146006933S, 2016 Conn. Super. LEXIS 1781, at *10 (June 15, 2016) (citing 3 Restatement, Torts § 708, p. 519).   In purporting to separate from the Company without returning misappropriated Company business information, Pollard has engaged in wrongful conduct. While an individual is permitted to prepare to compete with his employer following separation, he cannot do so by misappropriating its protectable business information and then refusing to return it upon demand.  In so conducting himself, particularly his refusal to remedy what he wrought, Pollard committed this tort and has necessitated the immediate intervention of this Court.

The Company has also alleged, upon information and belief (Complaint, ¶¶ 37, 43[g], 53[g], 56[a][ii] and 56[g]), that Pollard is already competing with it for business from its customers.  Pollard's failure to cooperate in identifying Protected Company Information and

Customer/Supplier Communications on his personal network and providing that information to the Company has prevented the Company from confirming that this is the case. However, as noted at the conclusion of the Statement of Facts and set forth in the Affidavit of Hugo Galletta, shortly before filing this application the Company learned information that appears to confirm that Pollard is now competing. By ordering a forensic examination as requested by the Company, the Court will shed light on whether Pollard is competing with the Company while he is still in his notice period and a Company employee. In turn, this will enable the Court to determine whether extension of Pollard's notice period is warranted under ¶ 8 of the Agreement. In view of Pollard's egregious conduct to date, pending the closer examination of Pollard's conduct that expedited discovery will permit, the Company submits that at this time the Court should extend the notice period beyond April 20 through and including the return date on the Company's preliminary injunction application.

### E.  The Court Should Extend the Contractual Notice Period Beyond April 20 if Discovery Indicates that Pollard has Breached Any Covenants in ¶ 8 of the Agreement.

Under ¶ 8 of the Agreement, the time limitation of any covenant set forth in that provision "shall be extended" for the period of time during which the covenant was violated. The 60-day notice period under the Agreement is set forth in ¶ 4. However, to the extent Pollard has violated any restriction set forth in ¶ 8 during the notice period, he has deprived the Company of the benefit of its bargain under the notice provision and the Court should extend the notice period accordingly.

Under ¶ 8 of the Agreement, for 18 months following the termination of his employment, Pollard cannot "call on or solicit in any manner any customer of the Company or its affiliates with which the Employee and his staff has had any dealing of any kind or upon whom Employee or his staff called during the course of Employee's employment by the Company...." As a

19

matter of both logic and Pollard's obligation to devote himself fully to the Company under ¶ 2 of the Agreement, it is apparent that ¶ 8 prohibits Pollard from soliciting on behalf of a competitor of the Company **during** his employment as well as after its termination. Setting to the side and reserving for another day the full scope of this restriction, this Court should extend the notice period beyond April 20 if discovery reveals that Pollard violated this restriction during the notice period or, of course, before its onset.   It necessarily follows that in the event Pollard has promoted any competitor of the Company to date (or himself as a "consultant" or "broker" in anticipation of diverting business from the Company), the Court should extend the notice period in order to ensure that the Company has the full benefit of that span of time without Pollard wrongfully competing against it or otherwise undermining its interests.

Under Connecticut law, a provision such as the one in ¶ 8 that extends a restriction for the period of time it was violated is enforceable.  *See, e.g., United Rentals, Inc. v. Bastanzi*, No. 3:05-cv-596 (RNC), 2005 U.S. Dist. LEXIS 45268, at *27-28 (D. Conn. Dec. 22, 2005 )(Court enforced one year restriction from date of its December 22 decision after employer discharged defendant employee on March 30 for competing with it while in its employ and defendant continued to compete following discharge); *United Rentals, Inc. v. Frey*, No. 3:10-cv-1628 (HBF), 2011 U.S. Dist. LEXIS 16375, at *30 (D. Conn. Feb. 17, 2011) (Court enforced one year restriction from date of its February 2011 decision after defendant employee separated and began competing in October 2010); *Kx Indus., L.P. v. Saaski*, No. CV-960386806S, 1997 Conn. Super. LEXIS 2444, at *25 (Aug. 29, 1997).   In *Kx Indus., L.P.* at *2, 21, 23, 25, the agreement prohibited an employee from working for certain competitors for one year following the termination of employment.   However, it also provided that in the event the employee went to work for a prohibited competitor during that period without providing notice, the restriction

20

extended until one year had passed from when the former employer learned that the employee was working for that prohibited competitor. The court enforced the provision, extending the restriction **past the April 1997** date to which it would have otherwise run--which was just one year following the employee's separation--through a date in **March 1998** that was 1 year after the employer learned of the employee's position with a forbidden competitor.

In view of the language of the Agreement that provides for the extension of restrictions when an Agreement provision has been violated and the favorable case law in this District, this Court has the power to extend the notice period under ¶¶ 6(D) and 8. Since Pollard has refused to honor the 60-day notice period for which the Agreement provides, in the event discovery reveals that Pollard has engaged in wrongful conduct in violation of the Agreement by competing with the Company or otherwise acting for the benefit of a competitor of the Company, this Court should extend the contractual notice period for a sufficient interval of time to ensure that the Company enjoys the benefit of the bargain coming to it as a result of the inclusion of ¶ 6(D) in the Agreement.

## IV.    CONCLUSION

For the reasons set forth above and in the Verified Complaint and the Affidavit of Hugo Galletta, the Court should issue the temporary restraints and preliminary injunctive relief requested by the Company in its Order to Show Cause.

Respectfully submitted,

PLAINTIFFS CELLMARK USA, LLC and
ANMAR INTERNATIONAL, LTD.

*/s/ Stephen P. Rosenberg*
Stephen P. Rosenberg (CT26601)
Littler Mendelson, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT 06510
Telephone: 203-974-8700
Facsimile: 203-974-8799
sprosenberg@littler.com

Jedd Mendelson
*Pro Hac Vice Application Pending*
Littler Mendelson, P.C.
One Newark Center, 8th Floor
Newark, NJ  07102
Telephone: 973-848-4700
Facsimile: 973-643-5626
jmendelson@littler.com

Their Attorneys

Dated:  April 6, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 6, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of his filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

Additionally, on April 6, 2018, a copy of the foregoing was served by email and Federal Express (Monday morning delivery) to the following attorney for Defendant Alan Pollard:

Peter J. Herrigel, Esq.
Herrigel & Herrigel
Hillside Square
8 Hillside Avenue, Suite 105
Montclair, NJ  07042

Email:  pjh@herrigellaw.com

*/s/ Stephen P. Rosenberg*
Stephen P. Rosenberg (CT26601)